1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

EASTERN DISTRICT OF CALIFORNIA

10

11  PAUL GUTIERREZ MORENO,                     Case No.  1:15-cv-00196-SKO

12          Plaintiff,                         **ORDER RE PLAINTIFF'S APPEAL**

13          v.

14  CAROLYN W. COLVIN,

    Acting Commissioner of Social Security,
15

16          Defendant.

    _____
17

18                          **I.    INTRODUCTION**

19          Plaintiff, Paul Gutierrez Moreno ("Plaintiff"), seeks judicial review of a final decision of

20  the Commissioner of Social Security (the "Commissioner") denying his application for Disability

21  Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act.  42 U.S.C. § 405(g).

22  The matter is currently before the Court on the parties' briefs, which were submitted, without oral

23  argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

24                        **II.    FACTUAL BACKGROUND**

25          Plaintiff was born on April 22, 1959, and alleges disability beginning on February 3, 2011.

26  (Administrative Record ("AR") 27-28; 184; 229.)  Plaintiff claims he is disabled due to dyslexia,

27  bipolar disorder, and back, arm, and neck pain.  (*See* AR 241.)

28  _____

[1]    The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 10; 11.)

**A.   Relevant Medical Evidence**

**1.   Medical Evidence Regarding Plaintiff's Alleged Physical Impairments**

On January 31, 2011, an MRI of the lumbar spine revealed

1. At the L5-S1 level, there is a 4.6 mm left paracentral disc bulge, better seen on the sagittal than axial views.  This is also associated with narrowing of the left neural foramen and lateral recess stenosis.  The combination of these findings is associated with encroachment upon the left L5 or left S1 nerve root.

2. At the L4-L5 level, there is a 3 mm broad-based disc bulge, better seen on the sagittal than axial views.  This also has a left paracentral component.  There is compression of the thecal sac and narrowing of the left neural foramen with encroachment upon the left L4 nerve root.

3. The upper lumbar spine demonstrates patent neural foramina with no nerve root compression.

4. There are multilevel degenerative changes.  The marrow signal appears normal.  The vertebral bodies demonstrate satisfactory alignment.  There is no acute fracture or dislocation.

(AR 279.)  On May 17, 2011, an MRI of the cervical spine revealed

1. Small to moderate central disc protrusion with spondylosis and moderate to moderately severe bilateral foraminal stenosis at C6-7.

2. Mild degenerative disc disease with a small central disc protrusion and mild right-sided neural foraminal narrowing at C5-6.

3. Small central disc protrusion and mild right-sided neural foraminal narrowing also noted at C4-5.

(AR 281.)

On March 8, 2011, neurosurgeon Shahram Ehteshami, M.D., examined Plaintiff on referral.  (AR 465.)  Dr. Ehteshami noted Plaintiff was alert, exhibited normal speech and normal strength, normal vibration sense, muscle tone, and reflection, "down-going plantars and no ankle clonus," and "possibly diminished pin-prick sensation" in his lateral right leg.  (AR 465.)

In April through June 2011, Plaintiff was seen at the California Pain Rehabilitation Institute and reported taking Cymbalta and Norco, being unable to sit/stand in one position for too long, low back pain, right shoulder and arm pain with sharp pressure in his wrist, right leg weakness, and tingling in his back.  (AR 282-89.)  Plaintiff reported wearing a back brace. (AR 289.)  Plaintiff reported pain on cervical exam but was otherwise normal; epidural injections and physical therapy were ordered to help with Plaintiff's gradually worsening pain.  (AR 284-

87.)   Rapid speech and stuttering were observed, and it was noted that there may be a psychological basis for Plaintiff's anorexia.  (AR 282.)   Plaintiff was diagnosed with lumbar degenerative disc disease, muscle spasm, cervical disc disease with radiculitis, depression, and insomnia.  (AR 283.)   A bone study on June 15, 2011, revealed no significant abnormalities, though degenerative changes of the lower lumbar spine and mid-cervical spine were observed. (AR 457-58.)

Abel Quesada, M.D., treated Plaintiff between June 28, 2011, and September 21, 2012. (AR 404-22; 606-39.)  On June 28, 2011, Plaintiff complained of continuous neck pain radiating to his left shoulder which increased when turning his head side-to-side, flexing and extending his head and neck, reaching or lifting, and with prolonged sitting and standing.  (AR 436.)  Plaintiff's neck pain vacillated throughout the day but averaged an 8/10.  (AR 436.)

Plaintiff complained of continuous pain in the right shoulder radiating to his right elbow, right arm, right wrist, and right hand and increased with rotation, reaching overhead, lifting, carrying, pushing, and pulling.  (AR 436.)  Plaintiff reported instability, clicking, popping, and grinding sensations, as well as swelling, numbness, tingling, and burning, with pain vacillating throughout the day but averaging a 7/10.  (AR 436.)

Plaintiff finally complained of continuous low back pain radiating to his upper back and right buttocks and increased with prolonged standing, twisting, walking, lifting, bending, stooping, squatting, and lying down on his back.  (AR 437.)   Plaintiff reported numbness, weakness, tingling, and burning sensation, and an average level of pain at 9/10.  (AR 437.)

From June through October 2011, based on his examination findings, Dr. Quesada opined Plaintiff could lift no more than 25 pounds, and was entirely precluded from repeated hand movements, repeated arm movements, and overhead reaching.  (AR 404-06; 409; 410-12; 415; 416-18; 421; 422-24; 4274-31.)  In July and August 2011 and February and March 2012, Plaintiff received acupuncture electrical stimulation and infrared therapy.  (AR 466-87; 488-502.)

On August 19, 2011, imaging of Plaintiff's right wrist revealed two centimeters of "fluic" collection in the triquetrum bone on the anterior aspect and a tear of the triangular fibrocartilage near the ulnar styloid process.  (AR 440-42.)  Imaging of Plaintiff's right elbow revealed increased

signal adjacent to the ulnar nerve which may represent inflammation, i.e., cubital tunnel syndrome (AR 443-45), and imaging of Plaintiff's right shoulder revealed a tear of the subscapularis tendon near the rotator cuff with a small amount of fluid in the subacromial-subdeltoid bursa indicating a full thickness tear and fluid surrounding the bicipital tendon in the bicipital tendon groove which may represent tenosynovitis (AR 445-47).

On October 12, 2011, Sarah Song, M.D. examined Plaintiff at the agency's behest. (AR 332-36.)  Plaintiff's chief complaints were pain in his back, neck, and shoulders.  (AR 332.) He reported that walking and standing were "okay" but he had difficulty bending over or lifting more than 10 pounds.  (AR 332.)  Plaintiff walked without evidence of a limp, had minimal tenderness in his back, and exhibited normal range of motion in his shoulders, elbows, wrists, hips, and ankles.  (AR 333-34.)  His hand grip strength tested between 55 and 60 pounds with his right hand and between 60 and 70 pounds with his left.  (AR 334.)  His motor strength, muscle bulk, and tone were all normal throughout his shoulders, elbows, hips, knees, and feet.  (AR 334-35.)  Dr. Song accepted Plaintiff's reported limitation to lifting 10 pounds and concluded that he could stand and walk for six hours in an eight-hour workday, sit without restriction, and perform frequent bending and twisting.  (AR 335.)

On October 28, 2011, State agency physician J. Linder, M.D., reviewed the medical evidence of record and concluded that Plaintiff retained the functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, and sit, stand, and walk "about" six hours in an eight-hour workday.  (AR 71-74.)  Dr. Linder found Plaintiff had no reaching or manipulative limitations and could frequently perform all postural activities except he could never climb ladders, ropes, or scaffolds.  (AR 71-74.)  Dr. Linder opined Plaintiff could perform the requirements of light work.  (AR 76.)

On January 4, 2012, treating physician Allen Fonesca, M.D., filled out a workers' compensation Treating Physician's Progress Report, reporting diagnoses of shoulder acromioplasty, rotator cuff syndrome, Guyon's canal syndrome, carpal tunnel syndrome, herniated nucleus pulposus, and degenerative disc disease based upon his objective findings on examination. (AR 400-03.)   On cervical examination, Dr. Fonesca observed limited range of motion in

Plaintiff's right shoulder, Tinel's sign in Plaintiff's right elbow, greater tuberosity in Plaintiff's right shoulder, pain on right shoulder abduction, spinous processes at C5, C6, and C7, and guarding at Plaintiff's left trapezius.  (AR 401.)  On lumbar examination, Dr. Foneca observed positive Lasegue's test on the left, spinous processes at L5 and S1, limited range of motion on flexion, extension, and bilateral bending, and tenderness to the bilateral multifidus muscles and left longissimus and iliocostalis muscles.  (AR 402.)  Dr. Fonesca requested authorization for a bilateral medial branch block at L4-L5 and L5-S1, an epidural injection on the right at C6-C7, an arthroscopic examination of the right shoulder with repair, and further radiological studies.  (AR 400.)

On April 23, 2012, State agency physician Keith M. Quint, M.D., reviewed the medical evidence and affirmed Dr. Linder's assessment.  (AR 100-03.)  Dr. Quint opined that Plaintiff's psychiatric presentation "appears to be most consistent w/ drug seeking behavior for benzos" rather than arising from a medically determinable impairment.  (AR 102.)

On May 23, 2012, Peter J. Mandell, M.D., the Agreed Medical Examiner in Plaintiff's workers' compensation case, reviewed Plaintiff's medical records and personally examined Plaintiff.  (AR 582-98; *see also* AR 711-12 (affirming May 2012 opinion after review of additional medical records).)  Plaintiff reported several work-related injuries from 2004 to 2011 for which he received conservative treatment.  (AR 583.)  Plaintiff reported that his current complaints included constant radiating pain in his neck, back, and right shoulder, decreased range of motion, and numbness and weakness in his hands.  (AR 583-84.)  Plaintiff stated that while "[s]itting was alright" and standing and walking around "[were]n't too bad either," stooping bothered his back.  (AR 584.)

Upon examination, Plaintiff demonstrated good posture, no spasms or tenderness, decreased range of motion in his cervical spine, and normal gait.  (AR 585-86.)  He exhibited no entrapment signs at the carpal tunnels, had equal and active deep tendon reflexes, good muscle strength, and could make good fists.  (AR 587-88.)  Dr. Mandell noted that injections, medication, and physical therapy would be beneficial, and that surgical intervention may become necessary, in the future.  (AR 589.)  Dr. Mandell concluded that Plaintiff would be precluded from "heavy

lifting, repetitive bending and stooping, and forceful pushing, pulling, lifting, and carrying." (AR 590.)

Dr. Garnica continued treating Plaintiff through September 2012. (AR 601-39.) Plaintiff continued to complain of constant, deep, stabbing pain in his low back, neck, shoulders, elbows, and wrists that varied in intensity with movement, self-rated at 10/10 without medication and 6/10 with pain medication. (*See* AR 601.) On October 4, 2012, imaging of the cervical spine revealed

> 1. C4-5: Moderate bilateral neural foraminal narrowing secondary to 1-2mm posterior disc bulge and uncovertebral osteophyte formation.
>
> 2. C5-6: Moderate bilateral neural foraminal narrowing secondary to 2mm posterior disc bulge and uncovertebral osteophyte formation.
>
> 3. C6-7: Moderate to severe bilateral neural foraminal narrowing secondary to 3-4mm posterior disc bulge and uncovertebral osteophyte formation.

(AR 598-600.)

On December 5, 2012, Kevin Calhoun, M.D., reviewed Dr. Mandell's assessment and personally examined Plaintiff before completing a Primary Treating Physicians' Initial Evaluation Report. (AR 649-57.) Plaintiff reported an industrial injury in 2010 when he "tripped over a forklift and fell on asphalt ground," and after getting up unassisted "experienced immediate pain to his neck, right shoulder, right elbow, right arm, right wrist, right hand, and lower back." (AR 650.) Plaintiff "continued to work thinking his pain would subside" but finally sought emergency medical care; an examination was conducted on his neck and it was determined he had a "strain." (AR 650.) Pain medication was provided and he was send back to work without restrictions. (AR 650.)

Later in the year, Plaintiff's primary care physician "Dr. William Carnita"[2] examined Plaintiff and ordered imaging studies; the results revealed disc damage to Plaintiff's neck and lower back. (AR 651.) Injections were administered with some success, oral pain medication was prescribed, and Plaintiff was sent back to work until February 2011; physical therapy was not recommended or provided. (AR 651.) Plaintiff was also referred to a psychiatrist in 2011, and reported ongoing emotional distress due to his symptoms. (AR 651.)

---

[2]   It is unclear whether, based on a review of the record, "Dr. Carnita" actually refers to William Garnica, M.D.

Plaintiff complained of constant pain in his neck at an 8/10, intermittent pain in his bilateral shoulders at a 4/10, pain in his right arm with numbness, tingling, and weakness, constant pain in his low back at an 8/10 radiating to his left leg, groin pain, and depression.  (AR 651.)  On examination Plaintiff's range of motion in his cervical spine was limited due to pain except for flexion and extension, which were accompanied by pain; range of motion in his bilateral shoulders was accompanied by pain except on bilateral flexion, left extension, and right external rotation, which were limited due to pain; range of motion of the lumbar spine was accompanied by pain except for extension, which was limited due to pain; and pain was noted on deep palpation of the lower lumbar spine at L5-S1.  (AR 653-55.)

Plaintiff reported difficulties showering, dressing, cleaning, and preparing food; typing, writing, and using the phone; standing, walking, sitting, lifting, twisting, squatting, climbing, and kneeling for prolonged periods of time; using his right hand for simple grasping, strong gripping, fingering, opening jars, and holding a cup; driving and riding in a vehicle for prolonged periods of time; maintaining sexual function; and falling asleep, remaining sleeping, or maintaining one position due to pain.  (AR 651-52.)  Dr. Calhoun affirmed Dr. Mandell's opinion as to Plaintiff's work restrictions.  (AR 655.)

On January 3, 2013, imaging of Plaintiff's cervical spine revealed

1.  Spondylotic change[ . . . ]

2.  L3-4:  2-3 mm posterior disc bulge resulting in moderate right neural foraminal narrowing in conjunction with facet joint hypertrophy.

3.  L4-5:  2-3 mm posterior disc bulge without evidence of canal stenosis or neural foraminal narrowing.

4.  L5-S1:  3-4 mm posterior disc bulge resulting in severe left neural foraminal narrowing in conjunction with facet joint hypertrophy.  Mild right neural foramin is seen.

(AR 646-48.)

On February 6, 2013, Dr. Calhoun opined Plaintiff was temporarily totally disabled through March 21, 2013, due to his right arm, cervical spine, and lower back pain.  (AR 641-45.)

//

//

## 2.    Medical Evidence Regarding Plaintiff's Alleged Mental Impairments

On April 30, 2012, State agency psychiatric consultant, George Coffee, M.D. reviewed the record and concluded Plaintiff did not have a severe mental impairment.  (AR 99-105.)  Dr. Coffee opined Plaintiff had only mild restrictions in his activities of daily living and difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.  (AR 101.)  Dr. Coffee further opined that Plaintiff's "allegations are seriously contradicted by his clinical presentation."  (AR 101.)

On August 28, 2012, Roy L. Curry, M.D. performed a comprehensive psychological assessment for Plaintiff's workers' compensation case.  (AR 676-709.)  Plaintiff has attended special education classes for two years in high school and despite failing to receive sufficient units to graduate, was given a diploma at the age of twenty.  (AR 677.)  Plaintiff reported multiple industrial injuries to his low back, right shoulder, and right elbow, as well as two hernias, since 1979.  (AR 677-78.)  Plaintiff reported declining work restrictions "because if he had light duty restrictions they might not have a job for him."  (AR 679.)  In 1995, he was hospitalized for 3-4 days on a 5150 psychiatric hold because he "was very upset and anxious" and "suicidal because his first wife had been unfaithful and wanted a divorce."  (AR 677.)  His wife is "erratic" and emotionally unstable, and is on supplemental security insurance benefits "for mental reasons." (AR 679.)

Plaintiff reported trying various exercises but being unable to work out due to pain. (AR 681.)  He purchased a walker and "a machine where you pull a rope with your arms and walk," and reported that some mornings he is unable to pick up his arms and raise them above his shoulders without pain.  (AR 681.)  Plaintiff "sits around, pets his dogs[,] . . . spends time listening to tapes on positive thinking" and tries to "keep[ ] his mind off his worries."  (AR 681.)

Plaintiff expressed "[s]adness, discouragement, frustration, feeling of being a loser and very frightened and anxious about losing everything he has worked for, such as his house." (AR 681.)  On mental status exam, however, Plaintiff was friendly, cooperative, likeable, and fairly easygoing and did not appear to be in acute distress.  (AR 684.)  His difficulties with comprehension were lessened when the questions were read to him.  (AR 684.)  His thought

processes were a bit tangential and he reported having racing thoughts, but few were observed during the interview.  (AR 684.)  He reported being suspicious and frightened of noises, but denied paranoid ideation, was not hallucinating, and was not psychotic.  (AR 684.)  Plaintiff's judgment, insight, and reality testing mechanisms were grossly intact.  (AR 684.)  Plaintiff's attention, concentration, and memory span were also fairly grossly intact.  (AR 684.)

Dr. Curry diagnosed Plaintiff with recurrent major depression in partial remission, dysthymia, mixed bipolar disorder, pain disorder, polysubstance dependence in remission, learning disorder NOS, and personality disorder NOS.  (AR 698-99.)  He further opined Plaintiff had been dependent on opiates and Klonopin "for some period of time" and that while Plaintiff would not benefit from ongoing psychotherapy, he would benefit from one clinician handling his medications and would "intermittently benefit" from use of an anti-depressant."  (AR 700.)

Dr. Curry noted the formal testing appeared to be "invalid and unusable" "due to overstatement and exaggeration on several different parameters."  (AR 698; 703.)  Dr. Curry further stated that "a variety of considerations makes validity [of testing] extremely questionable due to an apparent intentional or unintentional attempt to exaggerate problems and appear in a more unfavorable light than is actually the case."  (AR 703.)  "Overall, it should be stressed that the suggestion of significant exaggeration to the point of invalidity on the [test] makes the validity of the data of the other[ ] tests (which at face value suggested significant problems) highly questionable, as this data too is extremely likely to reflect significant exaggeration."  (AR 707.)

Dr. Curry finally noted that Plaintiff had "been dependent on opiates and to an extent on Klonopin for some period of time" and that Plaintiff "would benefit from one physician handling his medications" and "may intermittently benefit from [use of] an antidepressant."  (AR 700.)

**B.      Testimony**

**1.      Plaintiff's Self-Assessments**

On August 31, 2010,[3] Plaintiff completed an Adult Function Report.   (AR 221-28.) Plaintiff reported that on an average day, he will

---

[3]   The form is dated both September 1, 2011, and August 31, 2010.  (*Compare* AR 221 *with* AR 228.)  As the Court Transcript Index to the Administrative Record records the date as August 31, 2010, the Court has accepted that date. (*See* Doc. 12-2 (Court Transcript Index).)

> . . . wake up and shower, eat breakfast, take my meds, sit down at le[a]st for a[ ] half hour.  Depending how I wake up that morning effects my activit[ie]s for the day.  If I wake up in pain my activit[ie]s are limited.  I sit outside[,] water the lawn, play with my pets, and I just get some fresh air.  If I wake up normal[l]y without so much pain I'll visit some family, drive around, take care of my kids, and spend some time in the hobby room.  Watch t.v. or just kick back.

(AR 221; *see also* AR 224.)  Plaintiff takes care of his wife and children, shops every week for about 30-45 minutes, drives, and feeds and gives water to his pets.  (AR 222; 224.)  Plaintiff "need[s] to balance on something" to get dressed, and tosses and turns from pain while sleeping and wakes up with a stiff neck and back.  (AR 222.)  Plaintiff prepares meals "weekly" but notes that his "right arm is limited to movement and standing t[oo] long gives [him] pain in [his] back."  (AR 223.)  His medication makes him "sleepy."  (AR 224.)

Plaintiff reported his back pain affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate, understand, follow instructions, use his hands, get along with others, and remember.  (AR 226.)  He noted that "sitting makes [him] stiff and kneeling gives [him] muscle spasms" and "fustration" prevents him from getting along with others.  (AR 226.)  He can walk for about 15 minutes before needing to rest for half an hour, can only pay attention for about 90 seconds at a time, and cannot follow written or spoken instructions well.  (AR 226.)  He gets along with authority figures, handles stress and changes in routine poorly, and reports feeling "ashamed" and "fearful" in public, noting in particular his weight loss and "twisted" posture.  (AR 227.)  Plaintiff was prescribed an arm brace in 2011 and a back brace in 2004.  (AR 227.)

### 2. Third-Party Assessment

On September 4, 2011, Plaintiff's sister Silvia Garza completed a Third-Party Adult Function Report.  (AR 251-58.)  Her report is largely redundant of Plaintiff's Adult Function Report.  (*Compare* AR 221-28 *with* AR 251-58.)  Ms. Garza noted that Plaintiff has difficulty washing and combing his hair and shaving because he cannot lift his arm, has difficulty removing his pants, and needs help disrobing, dressing, and drying off after washing.  (AR 252.)  Ms. Garza also noted that because Plaintiff's wife is disabled, he used to cook meals for the family and shop but can no longer hold a knife or pan to prepare meals or wash dishes because of his pain.

1  (AR 253.)  Ms. Garza did not note Plaintiff had any memory problems or difficulty understanding

2  or getting along with others.  (AR 256.)

3       **3.**     **Hearing Testimony**

4       **a.**     **Plaintiff's Testimony at Hearing**

5       Plaintiff testified at the hearing that he graduated from high school and could read, but he

6  "cannot spell words, write words in any sentence or anything like that.  (AR 44.)  His sister drove

7  him to the hearing due to his medication.  (AR 44; 57.)  Plaintiff lives with his wife and three

8  minor children, does not prepare any meals or do any housework, and has difficulty bending to put

9  his shoes on and balancing to put on pants.  (AR 50; *see also* AR 59 (noting he doesn't cook

10  because his family members "don't like the way I cook").)  Plaintiff enjoys listening to music and

11  watching television a couple hours each day.  (AR 51.)  He takes Gabapentin, Hydrocodone,

12  Lydocaine, and Ketoprofen for his physical ailments and constant pain, and reported his

13  medication helps "a little" with his pain symptoms.  (AR 52.)  Plaintiff also takes Clonazepam,

14  Amitrtiptyline, and Citalopram for his mental health impairments, and reported that the current

15  medication cocktail was still being adjusted because "they're not really working that well."

16  (AR 52.)

17       Plaintiff testified that he was unable to work because he could not sit and get up out of the

18  chair, moving his neck to the side caused pain, he was on medication, and he had trouble sleeping

19  due to financial worries.  (AR 49.)  He testified that he could not lift both hands above shoulder

20  level, bend at the waist, stoop, or squat and that he could only tolerate sitting still or being on his

21  feet for twenty to thirty minutes at a time before his back would start hurting.  (AR 54-55.)  He

22  also has a cyst on his right wrist that causes numbness across his whole forearm, has bilateral

23  "tennis elbow" for which he has had Cortisone shots, and can lift about five to ten pounds at the

24  most.  (AR 55.)  Plaintiff reported having problems "remembering what [he's] doing from one

25  minute to another" but is able to recall what he sees on the evening political news television

26  shows.  (AR 56.)  He is "too emotional and the pain is just too severe" to allow him to work.

27  (AR 57; 59.)

28  //

**b.    Vocation Expert Testimony at Hearing[4]**

The Vocational Expert ("VE") testified at the hearing that Plaintiff had prior relevant work experience as a carpenter, DOT 860.381-022, medium work with an SVP level of 7,[5] and a job performed as heavy work with an approximate SVP of 3 combining the requirements of: crew boss, DOT 850.137-014, medium work with an SVP of 6, stores laborer, DOT 922.687-058, medium work with an SVP of 2, and weight clerk, DOT 221.587-030, light work with an SVP of 3.  (AR 60-62.)  The VE testified that Plaintiff's past relevant work had no skills transferable to sedentary work.  (AR 62.)

The ALJ asked the VE to consider an individual of Plaintiff's same age, education, and work experience who can lift and carry 20 pounds occasionally and 10 pounds frequently; stand, sit, and walk with normal breaks for about six hours in an eight hour work day; never climb ladders, ropes, and scaffolds; can only perform simple, repetitive tasks; and has no manipulative or environmental limitations.  (AR 62-63.)  The VE testified that such a person could perform the requirements of packing line worker, DOT 753.687-038, and garment sorter, DOT 222.687-014, both light, unskilled work with an SVP of 2, as well as ampule filler, DOT 559.685-018.  (AR 63.)

The ALJ then asked whether a hypothetical individual precluded from heavy lifting, repetitive bending and stooping, forceful pushing, pulling, lifting, and carrying could perform the requirements of the three identified jobs.  (AR 64.)  The VE testified that such a person could still perform the requirements of packing line worker, DOT 753.687-038, and garment sorter, DOT 222.687-014, both light, unskilled work with an SVP of 2, as well as ampule filler, DOT 559.685-018.  (AR 64.)

The ALJ then asked whether a hypothetical individual able to lift and carry 10 pounds occasionally and frequently, stand and walk six hours out of an eight hour day with normal breaks, sit without restriction, and unable to frequently bend over and twist would be limited to sedentary

---

[4]    The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and its companion publication, the Selected Characteristics of Occupations ("SCO"), except where he explained any inconsistency.  (AR 60.)

[5]    Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

1   work.  (AR 64.)  The VE testified that such person would be limited to sedentary work.  (AR 65.)

2   **C.       Administrative Proceedings**

3        On July 25, 2013, the ALJ issued a written decision and found that Plaintiff had severe

4   impairments of degenerative disc disease of the cervical and lumbar spine, tear of the right

5   shoulder subscapularis tendon, mood disorder, and history of polysubstance abuse, in recent

6   remission.  (AR 18.)  The ALJ determined that these impairments did not meet or equal a listed

7   impairment.   (AR 19-20.)   The ALJ found Plaintiff retained the residual functional capacity

8   ("RFC") to

9
        . . . lift and/or carry 20 pounds occasionally and 10 pounds frequently; he can sit,
10        stand, and/or walk for about six hours (each) in an eight-hour workday with
        normal breaks; pushing and pulling hand and/or foot controls is unlimited except
11        as shown for lifting and carrying.  He can frequently perform[ ] all postural
        activities, but climbing ladders, ropes, or scaffolds is precluded.  He has the
12        mental residual functional capacity to perform simple, repetitive tasks.

13   (AR 20.)

14        Given this RFC, the ALJ found that Plaintiff was unable to perform his past relevant work.

15   (AR 26.)  After considering Plaintiff's age, limited education, work experience, and RFC, the ALJ

16   determined there were jobs existing in significant numbers in the national economy Plaintiff could

17   perform, including representative occupations packing line worker, DOT 753.687-038, garment

18   sorter, DOT 222.687-014, and ampoule filler, DOT 559.685-018, all light, unskilled work with an

19   SVP of 2.  (AR 27.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social

20   Security Act.  (AR 28.)

21        The Appeals Council denied Plaintiff's request for review on December 10, 2014, making

22   the ALJ's decision the Commissioner's final determination for purposes of judicial review.

23   (AR 1-6.)

24   **D.       Plaintiff's Complaint**

25        On February 5, 2015, Plaintiff filed a complaint before this Court seeking review of the

26   ALJ's decision.  (Doc. 1.)  Plaintiff argues that the ALJ erred in discrediting Plaintiff's treating

27   physician's medical opinion and in discrediting Plaintiff's subjective testimony.  (Docs. 17; 23.)

28   //

1

### III.   SCOPE OF REVIEW

2       The ALJ's decision denying benefits "will be disturbed only if that decision is not

3   supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

4   601 (9th Cir. 1999).   In reviewing the Commissioner's decision, the Court may not substitute its

5   judgment for that of the Commissioner.   *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

6   Instead, the Court must determine whether the Commissioner applied the proper legal standards

7   and whether substantial evidence exists in the record to support the Commissioner's findings.   *See*

8   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

9       "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*

10  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).   "Substantial evidence" means "such

11  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

12  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

13  305 U.S. 197, 229 (1938)).   The Court "must consider the entire record as a whole, weighing both

14  the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

15  may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

16  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

17

### IV.   APPLICABLE LAW

18      An individual is considered disabled for purposes of disability benefits if he is unable to

19  engage in any substantial, gainful activity by reason of any medically determinable physical or

20  mental impairment that can be expected to result in death or that has lasted, or can be expected to

21  last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

22  1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

23  impairments must result from anatomical, physiological, or psychological abnormalities that are

24  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

25  such severity that the claimant is not only unable to do his previous work, but cannot, considering

26  his age, education, and work experience, engage in any other kind of substantial, gainful work that

27  exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

28  //

1  The regulations provide that the ALJ must undertake a specific five-step sequential
2  analysis in the process of evaluating a disability.  In Step 1, the ALJ must determine whether the
3  claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b),
4  416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe
5  impairment or a combination of impairments significantly limiting her from performing basic
6  work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, the ALJ moves to Step 3 and determines
7  whether the claimant has a severe impairment or combination of impairments that meet or equal
8  the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is
9  therefore presumptively disabled.  *Id.* §§ 404.1520(d), 416.920(d).  If not, at Step 4 the ALJ must
10  determine whether the claimant has sufficient RFC despite the impairment or various limitations
11  to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, at Step 5, the burden shifts to the
12  Commissioner to show that the claimant can perform other work that exists in significant numbers
13  in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or
14  not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v.*
15  *Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

16  **V.   DISCUSSION**

17  Plaintiff contends the ALJ erred in failing to fully credit the opinion of treating physician
18  Dr. Quesada and by finding Plaintiff not credible.  (Docs. 17; 23.)

19  **A.      The ALJ's Consideration of the Medical Evidence**

20  Plaintiff contends the ALJ erred in rejecting some of the functional limitations to which
21  Dr. Quesada opined.  (Docs. 15; 17.)  The Commissioner responds that the ALJ properly rejected
22  those parts of Dr. Quesada's opinion which were not supported by the overall record.  (Doc. 22.)

23  **1.      Legal Standard**

24  The medical opinions of three types of medical sources are recognized in Social Security
25  cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not
26  treat the claimant (examining physicians); and (3) those who neither examine nor treat the
27  claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).
28  Generally, an examining physician's opinion is entitled to greater weight than a non-examining

physician's opinion.  *Id*.  Where a treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id*. at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  Factors relevant to evaluating medical opinions include the amount of relevant evidence that supports the opinion and the quality of the explanation provided and the consistency of the medical opinion with the record as a whole.  *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

### 2.     The ALJ's Consideration of Dr. Quesada's Medical Opinion

The ALJ noted that he had accorded "some weight" to Dr. Quesada's opinions submitted to the state workers' compensation agency between July 29, 2011, and August 8, 2012.  (AR 22.) Specifically,

> . . . Dr. Quesada opined [Plaintiff] could return to work, lifting more than 25 pounds, and [would be] precluded from repeated hand movements, repeated arm movement, and overhead work.  The findings of Dr. Quesada described [Plaintiff] could return to work with a less than full range of light limitations similar to those provided herein.  Thus, I have given some weight to Dr. Quesada's opinion. However, I have provided for additional limitations given the entire evidence of record and this being a Social Security ruling based decision.

(AR 22.)  The ALJ emphasized that the "definition of disability in a workers' compensation case is not the same as a Social Security disability case" because workers' compensation cases "look only at the claimant's ability to return to the job being performed at the time of the injury.  Hence, opinions that an individual is 'disabled,' whether temporarily or permanently, in whole or in part, are not probative."  (AR 21.)

Plaintiff contends the ALJ's failure to adopt Dr. Quesada's opinion that Plaintiff would be precluded from repeated hand and arm movements and overhead work into his RFC assessment was reversible error.  (Doc. 17, p. 7.)  Because the three jobs identified by the VE require at least frequent to occasional reaching, handling, and fingering, *see* DOT 222.687-014, 559.687-014,

573.687-038, had the ALJ incorporated Dr. Quesada's manipulative limitations into his RFC and hypothetical to the VE, it is possible the VE would have testified that Plaintiff was unable to work. Plaintiff's contention the ALJ failed to provide legally sufficient reasons for rejecting Dr. Quesada's opinion is unpersuasive.

The ALJ specifically rejected Dr. Quesada's opinion that Plaintiff was precluded from hand movements, arm movements, and overhead work as inconsistent with the less-restrictive assessments opined to by Plaintiff's workers' compensation examining physicians Drs. Mandell and Calhoun, and state agency consultative physicians Drs. Linder and Quint.  (AR 22-26.)

The ALJ explained that "Dr. Mandell had the opportunity to review numerous records, and also examined [Plaintiff]; thus, his opinion appears to be better supported by medical findings than Dr. Quesada's opinions, which [Dr. Mandell had] reviewed."  (AR 22; *see* AR 582-97.)  On May 23, 2012, Dr. Mandell had noted no spasms or tenderness in Plaintiff's upper extremities, no entrapments signs at the carpal tunnels, normal reflexes, normal gait, good muscle strength, and the ability to make good fists.  (AR 586-88.)  Dr. Mandell also noted Plaintiff had received only conservative treatment for his industrial injuries from 2004 to 2011.  (AR 583.)

While Dr. Mandell opined that injections, medication, and physical therapy would be beneficial and that surgical intervention eventually may eventually become necessary (AR 589), he only specifically opined that Plaintiff would be precluded from "heavy lifting, repetitive bending and stooping, and forceful pushing, pulling, lifting, and carrying" (AR 590; *see also* AR 711-12 (affirming May 2012 opinion after review of additional records through January 2013)). As the ALJ noted, Dr. Mandell's opinion was affirmed by Dr. Calhoun in December 2012.  (AR 22 (citing AR 655 (Dr. Calhoun's affirmance of Dr. Mandell's opinion as to Plaintiff's work restrictions in a "Primary Treating Physician's Initial Evaluation" completed for workers' compensation)).)

The ALJ was entitled to discount the weight given to Dr. Quesada's opinion that Plaintiff was completely precluded from arm and hand movement and overhead work based on the opinions of examining physician Dr. Mandell, *see Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (examining physician's opinion alone constitutes substantial evidence, because it rests

on his own independent examination), and primary care physician Dr. Calhoun, *see Crane v. Shalala*, 76 F.3d 251, 253-54 (9th Cir. 1996) (treating physician's opinion that plaintiff was employable may alone constitute substantial evidence).

The ALJ also noted that neither of the state agency physicians, Drs. Linder and Quint, had opined that Plaintiff had any manipulative limitation based on their exhaustive reviews of the record. (AR 23; *see* AR 71-74; 100.) The ALJ properly accorded greater weight to their opinions as consistent with the overall record. *See Salee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (findings of a nontreating, nonexamining physician can amount to substantial evidence so long as they are supported by other evidence within the record.) Even Dr. Song, to whom the ALJ accorded "little weight," did not opine to any manipulative limitations despite diagnosing Plaintiff with bilateral shoulder pain and cervical and lumbar disc disease, and basing her overall opinion almost entirely upon Plaintiff's own subjective reports of symptoms and limitations. (AR 23; 333-34 (noting normal motor strength, muscle bulk, and tone, normal range of motion in Plaintiff's wrists, elbows, and shoulders, and no evidence of atrophy).)

No other physician opined that Plaintiff would have any functional limitations to his ability to move his arms or hands, or his ability to do overhead work. (*See generally*, AR.) The ALJ properly rejected Dr. Quesada's opinion as to Plaintiff's manipulative limitations as being inconsistent with the other medical evidence of record. *Valentine*, 574 F.3d at 692; *Lester*, 81 F.3d at 830-31.

In sum, the ALJ did not err in his consideration of Dr. Quesada's opinion.

**B.      The ALJ's Consideration of Plaintiff's Testimony**

Plaintiff contends the ALJ failed to articulate clear and convincing reasons for discounting his statements regarding the severity and extent of his ongoing symptoms. (Docs. 17; 23.) The Commissioner contends the ALJ properly relied on evidence in the record that undermined the credibility of Plaintiff's subjective complaints. (Doc. 22.)

**1.      Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell*

*v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  The ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591. The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).   If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection.  *Id.*

The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); 20 C.F.R. §§ 404.1529, 416.929.   "If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing."  *Tommasetti*, 533 F.3d at 1039.

### 2.    The ALJ's Consideration of Plaintiff's Credibility

The ALJ provided several reasons for finding Plaintiff less than fully credible.  The ALJ noted that Plaintiff

> . . . acknowledged his activities of daily living included showering, eating, taking medications, sitting down for at least half an hour, watering the lawn, playing with pets, visiting family members, driving around, going outside, taking care of his kids, spending time in the hobby room, and watching television.  He admitted car[ing] for his wife and children, including attending to them when sick, driving them around, making money, and performing errands.  He took care of pets including feeding and watering with the help of his family.  Other than alleging he needed something to balance himself while dressing, [Plaintiff] acknowledged that he had no difficulty performing personal care.  He stated he went outside daily, he went out alone, he drove a car, and shopped in stores weekly for approximately 30-45 minutes.  [ . . . ]  Despite his alleged impairments, he acknowledged he could walk for about 15 minutes before needing to rest, he required half an hour of rest before resuming walking, he could [maintain] attention for about 90 seconds, and he could get along with authority figures.

1    (AR 26.)

2        While the mere fact that a claimant engages in certain daily activities does not necessarily

3    detract from her credibility as to overall disability, daily activities support an adverse credibility

4    finding if a claimant is able to spend a substantial part of his day engaged in pursuits involving the

5    performance of physical functions or skills that are transferable to a work setting.  *Orn*, 495 F.3d

6    at 639; *see also Thomas*, 278 F.3d at 959.  A claimant's performance of chores such as preparing

7    meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others

8    has been considered sufficient evidence to support an adverse credibility finding when performed

9    for a substantial portion of the day.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir.

10   2008); *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005); *Thomas*, 278 F.3d at 959.

11       The ALJ did not err by finding Plaintiff's daily activities undercut his subjective testimony

12   as to the limiting effects of his impairments.  This is not a case where the plaintiff testified that he

13   was completely dependent others for his activities of daily living -- in fact, Plaintiff testified that

14   because his wife is disabled, he largely cares for her and their children.  The only reason he does

15   not cook is because his family does not like his cooking, not because he is unable to prepare

16   meals.  He is able to independently take care of his personal needs, aside from some difficulties

17   with shoes and maintaining balance while putting on pants, waters his lawn and takes care of his

18   pets, goes out alone, visits with family, and runs errands.  (AR 26; *see* AR 44-56; 221-28.)  These

19   types of activities tend to suggest that Plaintiff may still be capable of performing the basic

20   demands of unskilled work on a sustained basis.  *See, e.g., Stubbs-Danielson*, 539 F.3d at 1175

21   (the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the

22   record reflected that the claimant performed normal activities of daily living, including cooking,

23   housecleaning, doing laundry, and helping her husband in managing finances – all of which

24   "tend[ed] to suggest that the claimant may still be capable of performing the basic demands of

25   competitive, remunerative, unskilled work on a sustained basis").  The ALJ properly discounted

26   Plaintiff's credibility based on his admitted activities of daily living.  *Id.*

27       The ALJ further noted that Plaintiff's testimony at the hearing "was inconsistent with his

28   prior statements and other record evidence."  Specifically,

1   [Psychological testing by Dr. Curry] was mostly invalid due to overstatement and exaggeration on several different parameters, and could not be entirely relied upon.  This report undermines the credibility of [Plaintiff]'s allegations.

2

3   [ . . . ]

   . . . Inconsistent with [Plaintiff] being documented as spending time with family, he alleged he did not spend time with others.

4

5   [ . . . ]

6   [Plaintiff] testified he could not write more than his name.  He alleged he could not lift his arms over the shoulders or move his neck to the side.   This is inconsistent with documented ranges of motion at the consultative examination[.]  He alleged difficulty putting on h[is] shoes.  He claimed his medications were not working.  He alleged he could not bend at the waist, stoop, or squat.  He alleged difficulty remembering things.  He claimed he should not be driving when taking medications.  He alleged he was unable to work because he could not sit or get up out of his chair, but he did while the hearing was in progress.  Thus, I find [Plaintiff]'s allegations not credible due to the aforementioned inconsistencies and exaggeration.

7

8

9

10

11

12   (AR 24-26.)   The ALJ also noted that he found Plaintiff less than credible, in part, because

13   Plaintiff's "demeanor" at the hearing "did not enhance the credibility of his allegations."  (AR 25.)

14   While the inconsistency of objective findings with subjective claims may not be the sole

15   reason for rejecting subjective complaints of pain, *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792

16   (9th Cir. 1997), it is one factor which may be permissibly considered with others, *Moisa v.*

17   *Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d

18   595, 600 (9th Cir. 1999).   An ALJ's credibility finding may properly be based on the

19   inconsistency between a claimant's subjective complaints and the objective medical evidence.  *See*

20   *Batson v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004); *Johnson v. Shalala*, 60 F.3d

21   1428, 1434 (9th Cir. 1995).  Here, the ALJ properly discounted Plaintiff's testimony that he could

22   not lift his arms over his shoulders or move his neck to the side as inconsistent with the

23   documented range of motion observed by consultative examiner Dr. Song.   (AR 23; 334-34.)

24   Plaintiff's argument that Dr. Quesada's opinion supports his testimony is unpersuasive because, as

25   discussed above, Dr. Quesada's opinion as to Plaintiff's manipulative limitations was properly

26   rejected as inconsistent with the overall medical record.  (*See supra*.)

27   An ALJ's credibility finding may also be based upon "ordinary techniques" of credibility

28   evaluation, including inconsistent statements, *Smolen*, 80 F.3d at 1284, and demeanor during the

1    hearing, *Tonapetyan*, 242 F.3d at 1148 (ALJ properly discredited claimant's testimony "citing her

2    lack of cooperation at the hearing, her presentation at the hearing, her tendency to exaggerate, her

3    inconsistent statements, and her lack of cooperation during consultative examinations").  *Thomas*,

4    278 F.3d at 960 ("ALJ properly rejected [the plaintiff's] testimony by using 'ordinary techniques

5    of credibility evaluation'" including observation of the plaintiff's "demeanor at the hearing" where

6    "she seemed to engage in considerable histrionic exaggeration"); *Tommasetti*, 533 F.3d at 1039 (in

7    weighing plaintiff's credibility, an ALJ may consider "testimony by the [plaintiff] that appears

8    less than candid").  *See also Batson*, 359 F.3d at 1193 (this Court must affirm "inferences

9    reasonably drawn from the record").  The ALJ properly discounted Plaintiff's credibility, in part,

10   on this basis.

11       Plaintiff contends the ALJ had an affirmative duty to "confront" Plaintiff about any

12   discrepancies the ALJ perceived between his testimony and the written record.  (Doc. 17, p. 12.)

13   However, Plaintiff cites no relevant authority for the existence of this duty, relying instead on

14   immigration cases involving denials of asylum based on adverse credibility findings.  (*Id.* (citing

15   *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000) and *Soto-Olarte v. Holder*, 555 F.3d 1089, 1092

16   (9th Cir. 2009).)  These cases are inapposite in the Social Security context.  Social Security law

17   has no affirmative requirement that an ALJ directly confront a claimant with inconsistencies in his

18   testimony.  Rather, it has been repeatedly held that inconsistencies between testimony and the

19   record is a valid basis for discounting a claimant's credibility.  *See Smolen*, 80 F.3d at 1284.

20       Here, the ALJ pointed to substantial evidence within the record rationally supporting a

21   finding that the breadth of Plaintiff's admitted daily activities and the underlying medical

22   condition established by the medical record were inconsistent with Plaintiff's subjective

23   complaints of disabling pain.  The Court is not tasked with substituting its discretion in the place

24   of the ALJ, *Edlund*, 253 F.3d at 1156; *Macri*, 93 F.3d at 534; even where "evidence is susceptible

25   to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's

26   conclusion must be upheld[,]"  *Thomas*, 278 F.3d at 954; *Andrews*, 53 F.3d at 1041.

27       The ALJ's reasons were properly supported by the record and sufficiently specific to allow

28   the Court to conclude that he rejected Plaintiff's testimony on permissible grounds.

1

## CONCLUSION

2        Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

3  evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court

4  DENIES  Plaintiff's  appeal  from  the  administrative  decision  of  the  Commissioner  of  Social

5  Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Carolyn W. Colvin,

6  Acting Commissioner of Social Security, and against Plaintiff Paul Gutierrez Moreno.

7
8  IT IS SO ORDERED.

9  Dated:   **June 7, 2016**                          /s/ *Sheila K. Oberto*

10                                              UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28